IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUSAN M. FAUST | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | NO.  24-406 |
| | : | |
| THE TRUSTEES OF THE | : | |
| UNIVERSITY OF PENNSYLVANIA, | : | |
| DR. JAMES WILSON | : | |

## MEMORANDUM

**MURPHY, J.**                                                                                     October 8, 2024

      This case is about a scholar named Dr. Faust who made a bargain with a powerful source of knowledge.  It started out productively, but it did not work out well.  Unlike that other Dr. Faust, this Dr. Faust's fate lies in the resolution of her more tellurian legal claims against her former employer and former boss for breach of contract, breach of the duty of good faith and fair dealing, unjust enrichment, and tortious interference.

      According to the complaint, over ten years ago, Dr. Faust was a post-doctoral scholar in the noted gene-therapy laboratory of Dr. James Wilson at the University of Pennsylvania.  She invented and ultimately patented a significant biotechnological advance.  For years, she has been frustrated by Penn's decisions about the patent — almost abandoning it; refusing to transfer it to her; failing to notify her when the patent was licensed; and refusing to pay her a share of the royalties generated.  This lawsuit will determine whether Penn, and Dr. Wilson, were within their rights or if they breached Penn's Patent Policy and otherwise wronged Dr. Faust.  Penn and Dr. Wilson moved to dismiss the complaint on many (many) grounds.  Dr. Faust offers an amended version of the complaint, and the parties accept that we may apply the motion to dismiss to the most recent version.  We deny the motion to dismiss, except as to count VI under the

Pennsylvania Wage Payment and Collection Law, which we dismiss.  With that caveat, we allow the case to proceed under the most recent version of the amended complaint.  *See* DI 28-3.

I.   **Background**

Because this is a motion to dismiss, we will outline Dr. Faust's allegations and accept them as true.[1]  Most of the allegations of the lengthy complaint do not bear on the motion, so this will be brief.  Dr. Faust was post-doctoral researcher at the University of Pennsylvania's Gene Therapy Program, which was led by Dr. Wilson.  DI 28-3 ¶¶ 13, 23-24.  NxGEN is Dr. Faust's company.  *Id.* ¶ 16.[2]  The gravamen of the complaint is that the defendants deprived Dr. Faust of her rights stemming from patented technology she developed while at Penn.

**The contract.**  As a condition of her employment, Dr. Faust agreed to Penn's Patent Policy.  *Id.* ¶ 38.  The Patent Policy vests ownership in employee inventions with Penn.  *Id.* ¶¶ 39-40.  But Penn agrees to: "(1) notify inventors immediately after it begins negotiations over licensing the inventor's invention; (2) pay the inventor 30% of any cash or non-cash compensation received as a result of licensing the invention; and (3) assign ownership rights to

---

[1] The parties briefed the motion on the basis of the original complaint (DI 1), but since then plaintiff moved to file an amended complaint (DI 22), withdrew that motion (DI 27), and then filed a second motion to file an amended complaint (DI 28).  To conserve effort all around, we will apply the motion to dismiss to the proposed amended complaint, and we will cite that proposed amended complaint as well.  *See* DI 28-3.  Defendants oppose the proposed amended complaint on futility grounds for the same reasons stated in their original motion to dismiss.  *See* DI 36.  The proposed amendments did not change our conclusions in any event.

[2] The most recent proposed amended complaint drops NxGEN as a plaintiff.  *See* DI 28-3.  That also eliminated original Count VI.

the invention back to the inventor if UPenn determines to abandon the patent application." *Id.* ¶ 42.[3]

**The patent.** In 2012, Dr. Faust's work at Penn under Dr. Wilson's supervision led to provisional patent applications naming as inventors her, Dr. Wilson, and a collaborator at Thomas Jefferson University named Dr. Rabinowitz. *Id.* ¶¶ 59-60, 62-63. Penn filed two provisional patent applications — a first on May 11, 2012, and a second containing additional data on March 14, 2013. *Id.* ¶¶ 62-63. Penn did not file a non-provisional application referencing the first provisional within a year of May 11, 2012, "therefore forfeiting the Patent Application's international rights." *Id.* ¶ 96.[4] Penn did not notify Dr. Faust of that decision. *Id.* ¶ 98. But Penn eventually filed a non-provisional patent application, only to abandon that application in 2015, again without notifying Dr. Faust. *Id.* ¶¶ 100-102. When Dr. Faust discovered Penn's intention to abandon, she learned that this had been Dr. Wilson's decision. *Id.* ¶ 105.

In the meantime, Dr. Rabinowitz learned of the planned abandonment from Thomas Jefferson. *Id.* ¶ 108. Dr. Faust and Dr. Rabinowitz decided to seek exclusive rights in the patent application and form a company to commercialize the technology. *Id.* ¶ 109. Thomas Jefferson transferred its rights in the patent application to Dr. Rabinowitz, but Penn refused to do the same for Dr. Faust. *Id.* ¶¶ 110-20. This came to a head in April 2016, shortly before the Patent Office

---

[3] The Patent Policy is attached behind the amended complaint. *See* DI 28-3 at 60-71 (ECF). Presumably the parties disagree about the meaning and implications of the Patent Policy, but for purposes of this motion, we accept Dr. Faust's characterization of Penn's obligations.

[4] Presumably something else happened (e.g., an intervening publication) to forfeit international rights.

3

was to deem the patent application abandoned, when Penn told Dr. Faust that it would maintain its ownership interest in the application or in any patent that issues from it. *Id.* ¶¶ 115-19. Dr. Faust and Dr. Rabinowitz were able to take over prosecution of the patent application, ultimately through NxGEN, but Penn's decision to retain ownership and not grant exclusivity to Dr. Faust made it practically impossible for Dr. Faust to commercialize the invention as she had hoped. *Id.* ¶¶ 119-20, 146-53. The patent issued in 2021. *Id.* ¶ 151; *see* U.S. Patent No. 11,015,210.

**The licensing revenue dispute.** During the process of taking over prosecution of the patent application and attempting to convince Penn to relinquish its rights, Dr. Faust came to believe that Penn had included the patent in several licensing deals to other companies. DI 28-3 ¶¶ 22, 126, 130-31, 170-71, 180-84, 191. Dr. Faust alleges that she was entitled to licensing revenue under the Patent Policy but never received any. Below is an outline of the alleged licensees and circumstances:

- Biogen: On November 17, 2016, Penn told Dr. Rabinowitz, who told Dr. Faust, that it had licensed the patent application to a "large entity," meaning a company meeting certain criteria relevant to the Patent Office. *Id.* ¶¶ 121-23, 149. After repeated inquiries, Penn told Dr. Faust on May 2, 2017, that Biogen was the licensee. *Id.* ¶¶ 124-26. According to Dr. Faust's interpretation of a 2016 press release, Biogen paid Penn millions of dollars for a license that included her patent application. *Id.* ¶¶ 130-31. In late 2023, Penn told Dr. Faust, for the first time, that she was not receiving any revenue under the Biogen license because Penn had decided to allocate 0% of the license value to her patent. *Id.* ¶¶ 137, 140-41, 252, 255. Dr. Faust alleges Penn did this intentionally to exclude her.

4

- RegenxBio: Dr. Wilson founded RegenxBio. *Id.* ¶ 51. According to Dr. Faust's interpretation of an SEC filing for RegenxBio, the license agreement between Penn and RegenxBio includes her patent. *Id*. ¶¶ 180-81. She discovered the filing in 2022. *Id.* ¶ 180. She was neither informed of nor compensated in connection with this license. *Id.* ¶¶ 185-86.

- Azenta: According to Dr. Faust's interpretation of certain technical and marketing materials, Penn licensed Dr. Faust's patent to Azenta Life Sciences. *Id.* ¶¶ 191-205. She was neither informed of nor compensated in connection with this license. *Id.* ¶ 206. Presumably, Dr. Faust discovered these facts recently, because the allegations were added only in an amended complaint in this litigation.

- Gemma and Franklin: Gemma Biotherapeutics and Franklin Biolabs are two newly announced companies said to be taking over Penn's Gene Therapy Program. *Id.* ¶¶ 22, 208-210. Dr. Wilson will lead the companies. *Id.* ¶ 208. Penn licensed Dr. Faust's patent to Gemma and Franklin without notifying or compensating her. *Id.* ¶¶ 217-21.

- 37 Penn Covered Entities: In 2022, during negotiations, Penn sent Dr. Faust an assignment agreement for her patent that included a grant-back to companies identified as "Penn Covered Entities," defined as "commercial entities that have an agreement to sponsor research at Penn, to collaborate with Penn and/or to license rights (directly from Penn or from a Penn licensee) for discoveries relating to adeno-associated vectors made by any Penn faculty member, either now or in the future." *Id.* ¶ 170. There are 37 such entities. *Id.* ¶ 173. From this and related correspondence, Dr. Faust infers that Penn has

5

already licensed her patent to "at least some of those" 37 companies, none of which she has been informed about.  *Id.* ¶ 176.

**The amended complaint.**  The amended complaint sets forth six counts.  First, Dr. Faust alleges that Penn breached its Patent Policy by licensing Dr. Faust's patent application — without notice or compensation — to Biogen, RegenxBio, Azenta, Gemma, Franklin, and the Penn Covered Entities.  *Id.* ¶¶ 222-33.  Second, Dr. Faust alleges that Penn breached the covenant of good faith and fair dealing by abandoning her patent application without notice; unreasonably refusing to transfer ownership of the patent to her; and unfairly allocating none of the Biogen license revenue to her through her patent.  *Id.* ¶¶ 234-58.  Third, Dr. Faust alleges that Penn unjustly enriched itself by retaining licensing revenue from Dr. Faust's patent for itself instead of allocating it to her.  *Id.* ¶¶ 259-65.  Fourth, Dr. Faust alleges that Dr. Wilson unjustly enriched himself in a similar way by directing Penn to allocate licensing revenue to his other patents rather than Dr. Faust's.  *Id.* ¶¶ 266-72.  Fifth, Dr. Faust alleges that Dr. Wilson tortiously interfered with her contractual rights with Penn under the Patent Policy by directing Penn to violate the policy in various ways.  *Id.* ¶¶ 273-84.  And sixth, Dr. Faust alleges that Penn violated Pennsylvania's Wage Payment and Collection law, 43 Pa. Stat. § 260.1 (WCPL), by failing to pay Dr. Faust the licensing revenue to which she was entitled under the Patent Policy.  *Id.* ¶¶ 285-301.

**The motion to dismiss.**  Defendants' motion to dismiss divides into statute-of-limitations arguments and *Iqbal*/*Twombly* arguments.  First, defendants argue that all the claims are time barred under the various applicable statutes of limitations, which range from two to four years.  DI 12-1 at 8.  Although the specifics vary somewhat, the gist of the argument is that Dr. Faust

6

knew or should have known of the various licenses and alleged violations of the Patent Policy in the 2016-17 timeframe, because that is when Dr. Faust started negotiating with Penn, investigating the situation, and came to understand Penn's position on transferring exclusive rights in the application. *Id.* at 8-14. In opposition, Dr. Faust argues that the statute of limitations argument is not ripe on a motion to dismiss, because (i) there are factual disputes about what Dr. Faust knew and when for purposes of applying the discovery rule; (ii) the Patent Policy is a continuous contract; and (iii) defendants should be equitably estopped because they actively concealed the alleged transgressions. *E.g.*, DI 15 at 8-12, 14-18, 9-12. Second, defendants argue that the pleadings of Counts I, II, III, V, VI, and VII are insufficient in various ways. These will be discussed individually below.

**II.   Analysis**

"Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). "The court must take the complaint's factual allegations as true. But it may disregard labels, conclusions, and formulaic recitations of the elements." *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 265 (3d Cir. 2021) (quotation omitted).

   a. **Statute-of-limitations arguments**

The parties appear to agree that Pennsylvania law applies[5] and to the basic framework

---

[5] We must apply Pennsylvania state law as interpreted by the Pennsylvania Supreme Court. *Fed. Home Loan Mortgage Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir.

7

laid out by defendants, which is reproduced below:

- Counts I-IV: Four years. *See* 42 Pa. Cons. Stat. § 5525(a); *Neely v. Waddell*, 296 A.3d 656, 656 (Pa. Super. Ct. 2023) (four-year statute of limitations for breach of contract and breach of duty of good faith and fair dealing claims); *Estate of Hogarty v. Jeffers Farms, Inc.*, 303 A.3d 482, 488 (Pa. Super. Ct. 2023) (four-year statute of limitations for unjust enrichment claims).

- Count V: Two years. *See* 42 Pa. Cons. Stat. § 5524(7); *Gok v. Roman Catholic Church*, 550 F. Supp. 3d 221, 236 (E.D. Pa. 2021) (two-year statute of limitations for tortious interference claim).

- Count VI: Three years. *See* 43 Pa. Cons. Stat. § 260.9a(g) (three-year statute of limitations for Pennsylvania Wage Payment and Collection Law).

Under Pennsylvania law, "[a] cause of action arises and the statute of limitations begins to run upon the occurrence of the final significant event necessary to make the claim suable." *Merv Swing Agency, Inc. v. Graham Co.*, 579 F. Supp. 429, 430 (E.D. Pa. 1983) (citing *Mack Trucks, Inc. v. Bendix–Westinghouse Automotive Air Brake Co.*, 372 F.2d 18, 20 (3d Cir. 1966)). The discovery rule "[t]olls the running of the applicable statute of limitations until the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct." *Morgan v. Petroleum Prods. Equipment Co.*, 92 A.3d 823, 828 (Pa. Super. Ct. 2014) (quotation omitted).

---

2003). "When the state's highest court has not addressed the precise question presented, a federal court must predict how the state's highest court would resolve the issue." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1373 n.15 (3d Cir. 1996). "Absent a definitive statement of the applicable law by the state's highest court, a district court may also consider the decisions of state intermediate appellate courts in order to facilitate its prediction." *Paolella v. Browning–Ferris, Inc.*, 158 F.3d 183, 189 (3d Cir. 1998) (internal citations omitted).

Although the statute of limitations is an affirmative defense, we may decide the issue on a motion to dismiss so long as we rest our analysis on plaintiffs' allegations and the accompanying documents of undisputed authenticity. *See Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017); *Hoffman v. Nordic Nats., Inc.*, 837 F.3d 272, 280 n.52 (3d Cir. 2016). Outside of that narrow situation, the application of the discovery rule is factbound. "[W]hile a court may entertain a motion to dismiss on statute of limitations grounds, it may not allocate the burden of invoking the discovery rule in a way that is inconsistent with the rule that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense." *Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014) (internal citation omitted). Further, when "the pleading does not reveal when the limitations period began to run . . . the statute of limitations cannot justify Rule 12 dismissal." *Id.* (quoting *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 835 (3d Cir. 2011). But denial of a motion to dismiss does not foreclose a defendant from developing the issue and advancing the defense later. *See D'Angelo & Eurell v. Allied World Speciality Insurance Company*, No. 23-397, 2023 WL 792867, at *6 n.11 (E.D. Pa. Nov. 16, 2023) ("This opinion should not be read to . . . foreclose [defendant's] affirmative defenses based on the statute of limitations. Our analysis here is based on the record we have and constrained by the lens of Rule 12.").

In this case, the pleadings do not require us to dismiss on statute of limitation grounds. For the contract-related claims, defendants advance a colorable argument that in 2016-17, Dr. Faust had good reason to know that defendants were in breach of the Patent Policy by not paying her royalties on the relevant licenses of her patent. But at this stage, defendants cannot foreclose the possibility that the Patent Policy is continuous in nature. A Pennsylvania Superior Court

9

explained:

> In general, the statute of limitations does not run against a contractual cause of action which is a continuing one. On a continuing contract which is entire, the statute of limitations begins to run only from the time when the breach occurs or the contract is in some way terminated. The test of continuity, so as to take the cause out of the operation of the statute of limitations, is to be determined by the answer to the question whether the services were performed under one continuous contract, whether express or implied, with no definite time fixed for payment, or were rendered under several separate contracts.
>
> If services are rendered under an agreement which does not fix any certain time for payment or for the termination of the services, the contract will be treated as continuous, and the statute of limitations does not begin to run until the termination of the contractual relationship between the parties.

*Thorpe v. Schoenbrun*, 195 A.2d 870, 872 (Pa. Super. Ct. 1963). The idea here is for an open-ended and ongoing contractual relationship, it is necessary to consider not only the breach but also the termination of the overall contractual relationship. The analysis is a fact-intensive one, and calls for a thorough inquiry into the contractual obligations, when payment(s) or performance(s) were due, and the circumstances surrounding breach and eventual termination of obligations (if any). *See GAI Consultants, Inc. v. Homestead Borough*, 120 A.3d 417, 424-26 (Pa. Commw. Ct.2015) (discussing some of these nuances). In reply, defendants dive into the Patent Policy to explain how the various obligations are due at times certain such that the Policy should not be viewed as continuous. DI 16 at 4-5. But the nature of the obligations and relationship between the parties is disputed, and therefore not an appropriate basis for dismissal of the breach of contract, breach of good faith and fair dealing, or unjust enrichment claims. *See* DI 15 at 15, 20-22. The same is true for the tortious interference claim because Dr. Faust alleges that she did not learn of the interference until she learned of the breach. *See id.* at 25. And as for the WPCL claim, we need not resolve the statute of limitations question because we dismiss that claim on sufficiency grounds as explained below.

### b. *Iqbal/Twombly* Arguments

Defendants argue that various aspects of counts I, II, II, V, and VI should be dismissed for failure to state a claim. With one exception, we decline.

First, defendants ask us to dismiss any claim related to the 37 Penn Covered Entities because there are "many possible (and reasonable) motivations for why" Penn would include grant-backs in a deal with NxGEN *other than* what Dr. Faust infers — that her patent is already licensed to those 37 entities. This may be true and is surely a good topic for exploration in discovery. But on a Rule 12 motion, we must credit Dr. Faust's contrary inference, which is a fair one (even if Penn is right that it is not the most likely one).

Second, defendants seek dismissal of any claim relating to the RegenxBio license because several portions of the license tend to indicate that the RegenxBio license would not include Dr. Faust's patent, and this suggests that her patent could have been excluded from the license. DI 12-1 at 17-18. Defendants' interpretations seem sound enough at a superficial level, but they are based on parts of a document for which we have no record and no context. We cannot dismiss the RegenxBio license-related claims because the pleadings do not conclusively establish that defendants are correct.

Third, defendants contend that the allegations that Penn failed to notify Dr. Faust cannot be sustained because even if true, the failure was harmless. According to defendants, because Dr. Faust found out about the prospective abandonment in time to take over prosecution and file a continuation, there could be no damages. But, as Dr. Faust pointed out during oral argument, that ignores certain expenses incurred by Dr. Faust to prosecute the patent on her own. For that reason, we will not dismiss the notification-related claims.

Fourth, defendants ask us to dismiss the good faith and fair dealing claim because (i) it cannot convert a permissive contract provision into a mandatory one and (ii) the pleadings do not allege that the conditions requiring Penn to grant Dr. Faust her patent have been met.  We disagree.  When contractual performance has a discretionary component, that certainly makes it harder to prove a failure to deal in good faith.  But defendants point to no authority that forecloses the possibility.  If Dr. Faust were alleging that Penn did something wrong by exercising its discretion *in good faith*, then defendants would have a point.  But here, Dr. Faust alleges bad faith.  That is sufficient at this stage (and that addresses part (ii) of defendants' argument as well).  *See, e.g., Huang v. BP Amoco Corp.*, 271 F.3d 560, 564-65 (3d Cir. 2001); *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 444 (3d Cir. 2001).

Fifth, defendants seek dismissal of the unjust enrichment claim because it is based on a written agreement (the Patent Policy) and because there is no allegation that Penn retained any benefit.  The former argument is legally correct, but because Penn is already aggressively disputing the breach of contract count, we are inclined to defer Dr. Faust's choice of theories until later in the case.  As to the latter argument, Dr. Faust's unjust enrichment claim requires pleading facts to show Penn "retained the benefit under circumstances where it would be inequitable to do so without payment of value." *Hickey v. Univ. of Pittsburgh*, 81 F.4th 301, 316 (3d Cir. 2023).  Defendants frame Dr. Faust's claim as focusing on Penn's decision to assign zero value to Dr. Faust's patent, which resulted in the revenue designated for inventors going to other inventors and not Dr. Faust.  In that scenario, defendants reason, Penn's actions deprive Dr. Faust of a benefit, but Penn does not retain that benefit — it flows to some other unnamed inventors.  This makes some sense, but it unfairly narrows the basis of Dr. Faust's claim.  As

12

stated in the amended complaint and elaborated on at oral argument, Dr. Faust alleges that Penn chose to include Dr. Faust's patent in the licensing deals, which increased their value, and then Penn retained some of that increased value unjustly. DI 28-3 ¶¶ 259-65; DI 37 at 57-59. Thus, we will not dismiss the unjust enrichment count at this time.

Sixth, defendants argue that we should dismiss the tortious interference count against Dr. Wilson because it is impossible for Penn's own employee to tortiously interfere with a contract between Dr. Faust and Penn. *See, e.g., Maeir v. Maretti*, 671 A.2d 701, 707 (Pa. Super. Ct. 1995) ("[T]here must be a contractual relationship between the plaintiff and a party other than the defendant."). Dr. Faust responds that Dr. Wilson was acting outside the scope of his employment when he interfered. We agree with the line of cases in this district recognizing that an employee can tortiously interfere with his employer's contracting if he is acting for his own purposes and not his employer's. *See Whaumbush v. City of Philadelphia*, 747 F. Supp. 2d 505, 513 (E.D. Pa. 2010) (citing cases). And we agree with Dr. Faust that the amended complaint alleges that Dr. Wilson contravened Penn policy and acted in his own interests when he blocked Penn from meeting its obligations to Dr. Faust and negotiating fairly with her. DI 28-3 ¶¶ 273-84. Defendants also argue that Dr. Faust failed to allege that Dr. Wilson's actions were improper, but we disagree with that as well. *See id.* (alleging that Dr. Wilson knowingly caused Penn to violate the Patent Policy). Thus, we will not dismiss the tortious interference count against Dr. Wilson.

Seventh, defendants urge dismissal of the Pennsylvania WPCL claim because it applies only to back wages, not future wages. The WPCL provides in relevant part:

> (a) Separated Employees. Whenever an employer separates an employee from the payroll, or whenever an employee quits or resigns his employment, the wages or

13

> compensation earned shall become due and payable not later than the next regular payday of his employer on which such wages would otherwise be due and payable. If requested by the employee, such payment shall be made by certified mail.

43 Pa. Stat. § 260.5. Defendants argue that none of what Dr. Faust seeks in her complaint can be characterized as "the wages or compensation earned," and we agree. Dr. Faust produced no authority that comes anywhere close to explaining how royalties allegedly due under the Patent Policy could fall within the WPCL. Of critical importance here, Dr. Faust separated from Penn in January 2013. DI 28-3 ¶ 73. At that time, according to the complaint, only the first provisional patent application had been filed. *Id.* ¶¶ 62-63. There are no allegations that Penn had yet made any relevant licenses, any revenue had been received, or any compensation was due at that time. Everything was entirely speculative. We cannot agree with Dr. Faust that her entitlement to compensation vests — such that it fits within the terms of the WPCL — at the moment of invention. *See* DI 15 at 28. Dr. Faust tries to analogize her situation to stock options, but stock options are documented, quantifiable, vested benefits that exist at the time of termination and are susceptible to transfer "not later than the next regular payday." § 260.5. The impossibility of Penn having transferred to Dr. Faust some now-appropriate quantum of value or rights "not later than the next regular payday" in January 2013 highlights why this count must be dismissed.

### III. Conclusion

For the reasons discussed above, the motion to dismiss (DI 12) is **GRANTED IN PART** and **DENIED IN PART** and the second motion to file a first amended complaint (DI 28) is **GRANTED**. Dr. Faust's count VI, violation of Pennsylvania's Wage Payment and Collection Law, is **DISMISSED**.